**Wayne HEPNER, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 03–96–00039–CR.**

Court of Appeals of Texas, Austin.

March 26, 1998.

Keith S. Hampton, Austin, for Appellant.

Ronald Earle, Dist. Atty., James Adkins, Asst. Dist. Atty., Austin, for State.

Before POWERS, ABOUSSIE and B.A. SMITH, JJ.

ABOUSSIE, Justice.

A jury found appellant guilty of capital murder. Tex. Penal Code Ann. § 19.03(a)(2) (West 1994). Because the State did not seek the death penalty, the district court assessed punishment at imprisonment for life. Tex. Penal Code Ann. § 12.31(a) (West 1994); Tex.Code Crim. Proc. Ann. art. 37.071, § 1 (West Supp.1998). Appellant brings forward four points of error challenging the sufficiency of the evidence and complaining of the admission of scientific evidence. We will affirm.

The body of the deceased, Carmen Calderon, was found at 3:00 p.m. on March 30, 1994, in the dining room of the house he shared with his sister and brother-in-law, Janie and Emilio Cruz. The medical examiner determined that he had been cut or stabbed sixty-six times. Most of these wounds were superficial or defensive in nature. Four stab wounds, however, penetrated Calderon's heart and lungs, and were fatal.

A large amount of blood had soaked into the carpet where Calderon's body lay. Blood was also splattered on the wall, and chairs and an ironing board had been knocked over, suggesting that there had been a struggle. Footprints, apparently made in blood and all displaying the same distinctive tread pattern, led from the body into the kitchen and back, then through the dining room and up the stairs to Calderon's bedroom. In the bedroom, drops of blood were found on a chest of drawers and in the closet. Notably, the intruder walked past but did not take numerous valuable items, including television sets and a videocassette recorder.

Calderon kept several hundred dollars in cash in a wallet in his bedroom. The wallet was not found after the murder. Calderon also regularly purchased jewelry which he kept in coffee cans in his closet. Cruz testified that Calderon often showed this jewelry

to him. Cruz noticed that many of the items bore a white sticker with the word "Monet," a brand name.

Calderon worked nights as a member of the cleaning crew at an Austin department store. His coworkers were Doug Stanley, Angel Ronje, and appellant. Cruz testified that Calderon spent a lot of time with these men and that appellant regularly visited Calderon in his home. In fact, appellant had visited Calderon only two days before the murder. Stanley and Ronje testified that Calderon was known to keep money and jewelry in his room.

Lori Bellinger, an acquaintance of appellant, testified that he came to her house at about 1:00 p.m. on the day of the murder. He had alcohol on his breath and blood on his clothes. Appellant told Bellinger he had cut his hand "at a store." Appellant asked Bellinger to go with him in his car to make a purchase. Bellinger noticed in the back seat of appellant's car "a couple of coffee cans pretty full of jewelry." Later, she examined the jewelry more closely and saw that much of it had "little tags [that] said Monet." Appellant and Bellinger drove to an unspecified location where she made the purchase with money given to her by appellant.[1] They returned to Bellinger's house, but soon left to make another purchase, after which they drove to appellant's house. Bellinger spent the rest of the afternoon at appellant's residence, leaving periodically in appellant's car to make purchases with money he gave her. Eventually, appellant ran out of cash and instructed Bellinger to take the jewelry in the coffee cans and sell or trade it "for what he wanted." Bellinger returned to appellant's house after one of her errands and found that he was gone. She left a message for appellant to call her and drove home.

Appellant was not at home because he was being questioned by the police. Austin police officer Daniel Zahara and another officer went to appellant's house at about 8:00 p.m. on March 30 after learning that appellant was one of Calderon's coworkers. When the officers, who were not in uniform, identified themselves as police officers, appellant "became very pale, swaying." Zahara "thought he was going to faint." Zahara noticed that appellant had a bandage on his right ring finger and that blood was dripping from the wound. Appellant told the officer that he cut his finger helping his father "hook up a trailer." Appellant agreed to go to the police station, where he gave the officers a written statement that was entirely exculpatory. He allowed the police to take his shoes and samples of his blood, hair, and saliva, and signed a written consent to search his residence. The officers took appellant home after arranging to meet him the following day for further questioning.

Appellant was not home when the officers arrived the next morning. They learned that he had gone to Pennsylvania, where he was arrested several days later. No incriminating evidence was found during a search of appellant's house.

A Department of Public Safety expert made a test print of appellant's left shoe and compared it to the prints found at the murder scene. He testified that the prints, including the random nicks and scratches referred to as "accidental characteristics," were identical. He concluded that the prints at the scene were made by appellant's left shoe and no other shoe. Human blood was found on the soles of the shoes but could not be typed. Blood found on the top portions of the shoes was consistent with appellant's blood type, but not Calderon's.

Three samples of the blood drops found in Calderon's bedroom, together with samples of appellant's and Calderon's blood, were analyzed at the Department of Public Safety laboratory. Appellant's blood was found to have the same PGM blood enzyme type (1–, 1 +) as the blood found in the bedroom, while Calderon's PGM blood type was different (1–). The prelinear chain reaction (PCR) test, a form of DNA analysis, also showed a match between the bedroom blood samples and appellant's blood (both were type 1.2, 4), but no match with Calderon's blood (type 4). According to the persons who performed

---

1. The jury was not told, but the record otherwise reflects, that Bellinger and appellant were buying crack cocaine.

these tests, the PGM and PCR results demonstrated that the blood in the bedroom could have been appellant's but could not have been Calderon's. The evidence also reflects that 14.7 percent of the North American population is PCR type 1.2, 4.

A second DNA test, the restriction fragment length polymorphism (RFLP) test, was also performed on the blood samples. Once again, the test showed a match between appellant's blood and the bedroom blood samples. The State's expert testified that the probability of finding an unrelated person at random whose DNA characteristics would match the crime scene blood was 1 in 5.5 billion.

In determining the legal sufficiency of the evidence to support a criminal conviction, the question is whether, after viewing all the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Geesa v. State*, 820 S.W.2d 154 (Tex.Crim.App.1991); *Griffin v. State*, 614 S.W.2d 155 (Tex.Crim.App.1981). In this cause, appellant does not deny that the blood and shoe print evidence supports a finding that he was present either during or after Calderon's murder. He also concedes that the evidence supports a finding that he was in possession of Calderon's property after the murder. He argues, however, that the evidence does not support his conviction for capital murder because the State did not prove beyond a reasonable doubt that he murdered Calderon or, alternatively, that he murdered him in the course of committing robbery.

 Appellant's argument rests in part on the contention that the State did not disprove two alternative hypotheses: (1) that he was not involved in the murder but merely stole Calderon's property after the murder was committed, or (2) that he murdered Calderon but formed the intent to steal only after the

murder was committed. This argument fails because the "reasonable alternative hypothesis construct," by which circumstantial evidence was deemed legally insufficient if it did not exclude all reasonable alternative hypotheses inconsistent with guilt, has been abolished. *Geesa*, 820 S.W.2d at 161.[2] It was for the jury, as trier of fact, to determine the proper inferences to draw from the evidence. If the circumstantial evidence, viewed in the light most favorable to the verdict, supports a finding of guilt beyond a reasonable doubt, the evidence is legally sufficient and it is irrelevant that the jury could have viewed the evidence more favorably to the accused.

 Viewed in the light most favorable to the jury's verdict, the evidence shows that appellant fatally stabbed Calderon, cutting himself in the process, then went to Calderon's bedroom, bleeding from the cut on his hand, and stole the money and jewelry he knew Calderon kept there. Appellant then sought out Bellinger and, still in his bloody clothes, began making purchases with Calderon's money and jewelry. From this evidence, and the evidence that appellant had ample time and opportunity to familiarize himself with Calderon's property and plan his actions, the jury could rationally conclude that appellant formed the intent to steal Calderon's property before he murdered him, and therefore that the murder was committed in the course of robbery. *See Nelson v. State*, 848 S.W.2d 126, 131–32 (Tex.Crim.App. 1992). The evidence is legally sufficient to sustain appellant's conviction for capital murder. Point of error one is overruled.

In his three remaining points of error, appellant contends the district court erred by admitting random match probability (RMP) evidence that estimates the probability that a randomly selected person will match the DNA profile of trace evidence. As noted above, the serologist who performed the DNA tests at the Department of Public Safety laboratory testified that the probability of a randomly selected person having a DNA

---

**2.** Each of the opinions cited by appellant in which evidence was deemed legally insufficient applied the reasonable alternative hypothesis construct: *Burns v. State*, 676 S.W.2d 118, 120 (Tex.Crim.App.1984); *Nathan v. State*, 611 S.W.2d 69, 78 (Tex.Crim.App.1981); *Flores v. State*, 551 S.W.2d 364, 367–69 (Tex.Crim.App. 1977); *Turner v. McKaskle*, 721 F.2d 999 (5th Cir.1983) (relying on Texas cases applying the construct).

profile that matched the blood found in Calderon's bedroom was 1 in 5.5 billion. Appellant urges that this RMP estimate should not have been admitted because the State failed to establish its relevance and reliability, and because any probative value the evidence might have had was substantially outweighed by the danger of confusion and unfair prejudice.

Appellant filed a motion to exclude the results of all DNA tests. At the pretrial hearing on this motion, the only witness to testify was Dr. Jonathan Koehler, an assistant professor at the University of Texas Graduate School of Business and adjunct professor at the University of Texas School of Law. Koehler's expertise is in statistical evidence and behavioral statistics, and he has published articles on the subject of statistical errors in the presentation of DNA evidence. Called by the defense, Koehler testified that a random match probability estimate is essentially meaningless in determining the probative value of a reported match between a defendant's DNA and the DNA of biological traces found at the scene of a crime. The significance of such a match is determined instead by the laboratory error rate; that is, by the testing laboratory's record of making false positive matches. For example, if the laboratory's false positive error rate is one percent, there is a 1 in 100 chance that the reported match between the defendant's DNA and the trace DNA is erroneous. In such a case, a random match probability of 1 in 5 billion does not accurately reflect the likelihood that the defendant was the source of the trace DNA, because an RMP estimate assumes a correct match. In this example, the likelihood that the defendant was not the source of the trace DNA is closer to 1 in 100, the laboratory error rate, than to the 1 in 5 billion RMP estimate. It was Kohler's opinion that RMP estimates are of no probative value whenever the random match probability is significantly smaller than the laboratory error rate. According to Koehler, some laboratory proficiency tests have shown that one to four percent of reported DNA matches are erroneous.

Koehler further testified that studies have shown that fact-finders give greater weight to evidence of a reported DNA match when they are told the RMP estimate than when they are told only the laboratory error rate. In one of these studies, conducted by Koehler and using as subjects persons who had been called for jury duty in Travis County, the subjects were given hypothetical fact situations in which the defendant's guilt of a crime was primarily dependent on a reported match between his DNA and the DNA of blood found at the scene of the crime. One group of subjects was told that there was a 1 in 1 billion probability of a random DNA match. A second group was told that there was a 1 in 1000 probability that the reported DNA match was erroneous. A third group was told both the random match and erroneous match probabilities. The first group, told only the RMP figure, found the defendant guilty more often than the second group, told only the probability of a false positive match. Members of the third group, told both probabilities, were as likely to find the defendant guilty as members of the first group. This demonstrated, said Koehler, that the statistically insignificant RMP figure had a greater impact on the subjects' decision-making process than the more significant laboratory error rate. Koehler attributed this to a misunderstanding of admittedly confusing statistical concepts. Kohler opined that the tendency of juries to give undue weight to RMP estimates renders such evidence unfairly prejudicial.

At the conclusion of Kohler's testimony, the court and defense counsel engaged in the following colloquy:

THE COURT: ... [T]he defense believes ... that [the jury will] give vastly greater weight to that [RMP] number as opposed to the error rate and your position is the error rate makes that other number somewhat meaningless in effect; that the only crucial number is an error rate....

MR. SMITH: In essence that is the argument and I don't think it matters what the error rate is if the expression of the RMP comes in and it's in a range far greater than that or smaller, however you want to phrase it.

THE COURT: What precludes an attorney from calling a witness such as the one you just had to explain to the jury? I can see just giving them the survey the bigger number, you know, obviously one in a billion strikes someone much harder than one in a thousand. They tend to give that more weight. But if you had a witness such as that to explain it to them, it's still your position that they would be incapable of understanding it even after an explanation?

MR. SMITH: No, I'm not saying that they would be incapable of it. I'm simply stating that the—that when that random match probability statistic comes in under the rules of criminal evidence that it's so prejudicial, it's so unfairly prejudicial that it completely outweighs and overshadows any probative value that that number would express.

. . .

And it's not that the jurors [are] not intelligent but the Texas Rules of Criminal Evidence obviously contemplated occasions when evidence which would otherwise be probative is so outrageously prejudicial that the jury cannot be expected to make that determination. Otherwise why would we have Rule 403 of the Texas Rules of Criminal Evidence[?]

. . .

In any event, what we're trying to keep out in this hearing is the RMP frequencies, trying to keep that out from the jury. If our expert . . . looks at those autorads and compares those and makes a determination that they appear to be a reported match, we're certainly not going to have any objection to that at trial. We don't intend to wage a battle about the admissibility of DNA evidence.

There is no record of a ruling on appellant's pretrial motion. At trial, appellant did not object to the admission of the expert testimony concerning the results of the PCR and RFLP tests, but did object to the RMP

testimony. Appellant now contends only that the State should not have been permitted to adduce the evidence that the random match probability was 1 in 5.5 billion.

The threshold determination regarding the admission of expert testimony about scientific, technical, or other specialized knowledge is whether the testimony will help the trier of fact understand the evidence or determine a fact in issue. *Kelly v. State,* 824 S.W.2d 568, 572 (Tex.Crim.App.1992); *Duckett v. State,* 797 S.W.2d 906, 910 (Tex. Crim.App.1990); Tex.R. Evid. 702.[3] When, as in this cause, a trial court is faced with an offer of expert testimony on a scientific topic unfamiliar to lay jurors, the court's first task is to determine whether the testimony is sufficiently reliable and relevant to help the jury in reaching accurate results. *Kelly,* 824 S.W.2d at 572. The burden of persuasion is on the proponent to demonstrate by clear and convincing evidence, outside the presence of the jury, that scientific evidence is reliable and therefore relevant. *Id.* at 573. After the trustworthiness of the evidence has been established, the trial court also must determine if the probative value of the expert testimony is outweighed by the danger of confusion, unfair prejudice, or any of the other considerations identified in Texas Rule of Evidence 403. *Id.* at 572.[4]

Appellant's pretrial motion broadly sought the exclusion of all DNA evidence on the authority of *Kelly* and rules 403, 702, and 705. Appellant did not obtain a ruling on this motion. Furthermore, counsel told the court at the hearing that appellant did not seek the exclusion of the DNA test results but only the exclusion of the random match probability estimates. Counsel articulated appellant's objection to the RMP testimony only in terms of rule 403: that whatever probative value the RMP evidence might have was substantially outweighed by the danger of confusion and unfair prejudice arising from the tendency of the jury to give undue weight to such evidence. We there-

**3.** Texas Rules of Evidence 403, 702, and 705, adopted effective March 1, 1998, are substantively identical to the corresponding criminal evidence rules in effect at the time of appellant's trial.

**4.** A similar test for admissibility applies under the federal rules. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 590–92, 113 S.Ct. 2786, 2795–96, 125 L.Ed.2d 469 (1993).

fore conclude that appellant did not preserve for appeal his complaints that the State did not prove the reliability of the RMP evidence, that the RMP evidence was in fact unreliable, and that the underlying facts or data did not provide a sufficient basis for the RMP testimony.

Appellant's contention that the RMP testimony should have been excluded pursuant to rule 403 is based on Koehler's testimony regarding the tendency of factfinders to give undue weight to random match probabilities, even when they are told the statistically more significant probability that the reported DNA match is the result of human or other error. The determination whether the danger of confusion or unfair prejudice outweighs the probative value of relevant evidence must be made in view of the availability of other means of proof and other factors appropriate for making decision of this kind under rule 403. *See Montgomery v. State*, 810 S.W.2d 372, 389 (Tex.Crim. App.1991) (opinion on rehearing). The trial court must be given wide latitude to exclude or not to exclude evidence under rule 403. *Id.* at 390. So long as the court operates within the boundaries of its discretion, an appellate court should not disturb its decision, whatever it may be. *Id.* While the *Montgomery* opinion dealt with evidence of extraneous misconduct, appellate courts must show the same deference to the trial court's decision to admit or exclude scientific evidence. *See Kelly*, 824 S.W.2d at 574.

*Assuming the accuracy of the reported DNA match,* the random match probability was obviously relevant to the question whether the blood found in Calderon's bedroom came from appellant. Even accepting as true the contention that untutored jurors tend to ignore the possibility of laboratory error and thereby give undue emphasis to the RMP estimate, the district court could reasonably decide that the probative value of the RMP evidence outweighed rule 403 concerns. As the court noted at the hearing, Koehler's studies of juror behavior did not take into account the possibility of educating the jurors, through expert testimony at trial, about the relative significance of RMP estimates and laboratory error rates. Koehler,

in his testimony at the pretrial hearing, was able to clearly and understandably explain why the probability of an erroneous match was of greater probative significance than the random match probability. The district court could reasonably conclude from this that it was possible to admit the RMP estimates without confusing the jury or unfairly prejudicing appellant. The district court's decision to admit the RMP testimony over appellant's rule 403 objection was within the zone of reasonable disagreement, and therefore not an abuse of its discretion.

Even if the admission of the random match probability evidence was error under either rule 702 or rule 403, the error did not affect appellant's substantial rights and was therefore harmless. Tex.R.App. P. 44.2(b); *see King v. State*, 953 S.W.2d 266, 271 (Tex. Crim.App.1997) (applying new harmless error rule in pending appeal). The evidence that the intruder went directly to Calderon's bedroom, ignoring valuable property as he did so, suggested that the murder/robbery was the act of someone, like appellant, who knew Calderon and where he kept his money and jewelry. The bloody footprints at the scene were made by appellant's shoe. The drops of blood were matched to appellant by blood enzyme type and by two DNA tests. Appellant had blood on his clothes, cash, and coffee cans of jewelry like Calderon's on the afternoon of the murder. Appellant was obviously nervous when the police arrived at his house and left the city that night, breaking an appointment to meet the police the next day. Given all of this evidence pointing to appellant as the murderer, any error in admitting the random match probability estimate was harmless. Points of error two, three, and four are overruled.

The judgment of conviction is affirmed.