# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

**NO. 03-01-00626-CR**
**NO. 03-01-00627-CR**
**NO. 03-01-00628-CR**

**Sherell Wray, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT**
**NOS. 994702, 994410 & 994418, HONORABLE FRED A. MOORE, JUDGE PRESIDING**

The district court found appellant Sherell Wray guilty of aggravated sexual assault (cause numbers 994410 and 994418) and aggravated kidnapping (cause number 994702). *See* Tex. Pen. Code Ann. '' 20.04, 22.021 (West Supp. 2002). The court sentenced him to sixty years=imprisonment for each offense. In two points of error, appellant contends the court erred by failing to find that he released the kidnapping victim in a safe place and by permitting an unqualified witness to testify to the statistical probability of a DNA match. We will affirm the judgments of conviction.

*July 23, 1999*

Appellant was convicted for sexually assaulting CM on the night of July 23, 1999. CM spent the afternoon and evening of that day at an Austin Motel 6 smoking marihuana with a friend and

acquaintances. Shortly before midnight, she asked for a ride home. Two men who had just arrived at the motel, and whom CM did not know, said they would take her. CM got into a green Trans Am with the two men; the smaller of the two men drove the car, the other man was in the passenger seat, and CM was in the back seat. Instead of taking CM home, the men drove to a remote area having dirt roads and tall weeds. After stopping, the driver of the car got into the back seat with CM and demanded that she perform fellatio. When she refused, he asked the passenger, ADog, where=s my pistol at?@ Believing that the passenger was reaching for a pistol, CM agreed to perform oral sex. After this, first the driver and then the passenger had sexual intercourse with CM. After the assaults, the men drove CM to her residence.

During the subsequent police investigation, CM and an officer attempted to retrace her activities on the day of the assaults. They drove in the officer=s unmarked car to the Motel 6 where CM first met the assailants. The officer went to the motel office to speak to the manager. As CM waited outside in the car, she saw the green Trans Am pull into the motel parking lot. When the officer returned to the car, CM told her, AThat=s him. That=s him. That=s them.@ The Trans Am drove away from the motel and was eventually stopped by a police cruiser. Three men were in the Trans Am. From her seat in the unmarked car, CM immediately identified the driver, Michael Bailey, as the smaller of the two assailants who had also been driving the car on the night of the assaults. CM indicated that another man in the Trans Am, Farrell Johnson, resembled the second assailant but she was hesitant to positively identify him. The third man in the Trans Am was appellant. In later photographic lineups, CM failed to identify Johnson but positively identified appellant as the second assailant. CM also identified appellant at trial.

*August 17, 1999*

2

Appellant was convicted for kidnapping and sexually assaulting CP on the night of August 17, 1999. CP and several of her friends spent the evening drinking at a number of downtown Austin clubs. CP became extremely intoxicated. She remembered leaving a club sometime between 10:00 p.m. and midnight, but could remember nothing else until she awoke in her car, parked outside a strange house, with a woman she had never met. This woman was Carolyn Sanchez, a crack addict who encountered CP on East 11th Street. Sanchez testified that CP=s car was parked on the wrong side of the street. CP was leaning out of the car, incoherent and Aout of it.@ Sanchez got into CP=s car and drove to a Ramada Inn where she had been smoking crack. Sanchez went into the motel intending to call for help. Instead, she went to sleep. When Sanchez awoke a short time later, she returned to CP, who was sleeping in her car outside the motel.

About this time, a Buick driven by Michael Bailey drove up to the Ramada Inn. In the car with Bailey were Cassandra Sorrells and appellant. Sorrells testified that she was employed by the Ramada Inn and that Bailey, her boyfriend, had driven her to work. Sorrells said that Bailey had a key to her house, that he was driving her Buick, and that appellant was with Bailey both when he took her to work that day and when he returned to the motel at about 3:00 a.m. Sanchez testified that she knew Bailey as a drug dealer, and that she approached him to make a purchase after Sorrells went inside the motel. He instructed her to follow him. Bailey then drove the Buick to Sorrells=s house on Felix Street while Sanchez followed in CP=s car. Both cars stopped in front of the house and appellant went inside. Bailey walked over to CP=s car, seized CP, and pulled her from the vehicle. He then dragged her into the house. Appellant came back

**3**

outside and told Sanchez, AGet out of here. Don=t tell anybody because we=ll kill you.@ Sanchez left in CP=s car.

CP remembered being taken to a bedroom where she was sexually assaulted by two men. After the assaults, the men took CP to what she remembered was a large American car and told her to lie down in the back seat. The smaller of the two assailants then drove the car to a rural area CP described as being Athe middle of nowhere.@ The men ordered her out of the car, then drove away. It was still dark. CP was wearing a torn shirt and jeans, and was barefoot. She could see no houses and had trouble walking on the unpaved ground. She hid behind a trailer, fearing that her assailants would return. She then began looking for help. The trailer where she had hidden appeared to be unoccupied, so she walked to another nearby trailer and knocked on the door. She thought she heard someone inside, but no one came to the door. Eventually, CP managed to stop a passing car and its occupants called the police.

CP was unable to identify either of her assailants. She did, however, identify Sanchez in a photo spread. She also identified a photograph of Sorrells=s house on Felix Street as the place where she was assaulted. Sanchez identified both Bailey and appellant in photographic lineups. She did not identify appellant at trial.

*Release in a safe place*

In his first point of error, appellant urges that the district court erred by convicting him of a first degree felony in the aggravated kidnapping cause. Aggravated kidnapping is ordinarily a first degree felony, but the offense is a second degree felony if the defendant proves by a preponderance of the evidence that he voluntarily released the victim in a safe place. Tex. Pen. Code Ann. ' 20.04(d) (West Supp. 2002). We review the relevant evidence to determine whether the court=s failure to find that CP was voluntarily released in a safe place was contrary to the great weight and preponderance of the evidence. *See Meraz v. State*, 785 S.W.2d 146, 155 (Tex. Crim. App. 1990).

The key issue is whether CP was released in a safe place. The factors relevant to this determination include the remoteness of the location, the proximity of persons who could aid or assist the victim, the time of day, the climatic conditions, the condition of the victim, the character or the location or the surrounding neighborhood, and the victim=s familiarity with the location or neighborhood. *Harrell v. State*, 65 S.W.3d 768, 772-73 (Tex. App.CHouston [14th Dist.] 2001, pet. ref=d).

A police officer described the location where CP was released: AThere=s mainly fields and that sort of thing. A lot of vacant area. And there would be a group of like trailer houses and the bait shop. But everything=s spread out. It=s out in the country.@ CP had been sexually assaulted by two strangers, and the examining nurse later found thirty-six areas of acute physical trauma to her body. CP was clothed but barefoot, was still under the influence of alcohol, and did not know where she was. She was afraid that her assailants, who she believed were armed, would return. It was before dawn, and CP was unable to rouse the residents of the trailer houses in the area. Eventually, a passing car stopped and its occupants

**5**

summoned help.  We conclude that the court=s failure to find that CP was released in a safe place was not against the great weight and preponderance of the evidence.  Point of error one is overruled.

*DNA testimony*

In his second point of error, appellant contends the district court erred by permitting Jane Burgett, a DNA analyst at the Department of Public Safety, to testify regarding the statistical probability of a DNA match.  Burgett analyzed the biological material collected on vaginal swabs during the post-assault physical examinations of CM and CP.  In each case, she found epithelial cell fractions that matched the victim=s known DNA sample, and sperm cell fractions indicating the presence of at least two contributors.  In each case, the DNA profile of one of the sperm cell contributors had the same unusual off-ladder allele or microvariance.  Burgett testified that she had been assigned to Abetween 180 and 250 cases in the last three years@ and had examined Aanywhere from one sample per case to 10 samples per case,@ that she had encountered only four microvariances during that time, and that she had never before seen this particular microvariance.  Burgett found the identical microvariance in a sample of appellant=s DNA.  The DNA profile of the second sperm cell contributor in each case matched the profile of Michael Bailey=s DNA.

Appellant did not object to the testimony summarized above.  He did object, however, when Burgett was asked the probability of inclusion for the sperm cell fractions, that is, the probability that a randomly selected unrelated person could have been the contributor of the trace evidence.[1]  During voir dire questioning by defense counsel, Burgett stated that she had studied statistics but did not have a degree in

---

[1] This is also referred to as the random match probability.  *See Hepner v. State*, 966 S.W.2d 153, 157-58 (Tex. App.CAustin 1998, no pet.).

**6**

that subject. AI am a biologist,@ she testified, AI am not a statistician.@ Appellant=s objection that Burgett was not qualified to testify to the statistical probabilities of DNA matches was overruled.[2]

After appellant=s objection was overruled, Burgett testified that the statistical calculations were complicated in these cases because the samples included DNA material from multiple contributors. She explained that in such cases Ayou must not only calculate the numbers for the alleles that exist at a particular locus, you must calculate the alleles that exist in every combination.@ In CM=s case, Athe probability of selecting [an] unrelated person at random who could be the contributor to the sperm cell fraction@ was one in 56,200 for blacks.[3] In CP=s case, the probability was one in 44,400. Burgett did not offer any further explanation as to how she calculated the probabilities of inclusion, other than to say that AI don=t think we do a regression analysis.@ She also knew that the department uses a database composed of 1,222 persons to calculate the probabilities, but she did not know Ahow the database itself was prepared other than the calculation of the frequencies of the DNA profile that occur and the alleles that occur in the database itself.@

The qualification of a witness to testify as an expert is within the discretion of the trial court. *Harnett v. State*, 38 S.W.3d 650, 657 (Tex. App.CAustin 2000, pet. ref=d). The proponent of the expert testimony must establish that the proffered witness is qualified to testify on the subject. *Id*. at 658. No rigid formula exists for determining whether a particular witness is qualified to testify as an expert. *Id*.

---

[2] We do not agree with the State that appellant failed to preserve this point of error for review.

[3] Both appellant and Bailey are African-American.

7

Appellant=s challenge to Burgett=s expertise in the district court was based solely on her lack of a degree in statistical analysis. Rule 702 provides, however, that the necessary expertise may be acquired through knowledge, skill, experience, training, or education. Tex. R. Evid. 702. Given Burgett=s three years of experience as a DNA analyst, the district court has not been shown to have abused its discretion by permitting Burgett to testify to the random match probabilities.

We further conclude that any error in the admission of the challenged testimony did not affect a substantial right. *See* Tex. R. App. P. 44.2(b) (test for harmless error). Burgett testified without objection that appellant=s known DNA profile contained a microvariance that was unique in her experience, and that the same microvariance was found in the sperm samples taken from the victims. In addition, CM identified appellant as one of her assailants both in a pretrial photographic spread and at trial. Although CP was unable to identify her assailants, testimony by Carolyn Sanchez and Cassandra Sorrells also linked appellant to that assault. In light of this other evidence, we are satisfied that the admission of Burgett=s random match testimony, if error, did not have a substantial influence on the finding of guilt. Point of error two is overruled.

The judgments of conviction are affirmed.

_____

Lee Yeakel, Justice

Before Justices Kidd, B. A. Smith and Yeakel

Affirmed

**8**

Filed:   November 15, 2002

Do Not Publish