# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00370-CR

**Jose Luis Aguirre, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 403RD JUDICIAL DISTRICT NO. 3022388, HONORABLE DONALD LEONARD, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Jose Luis Aguirre appeals following his conviction by a jury of capital murder. The trial court sentenced appellant to life in prison. In four points of error, appellant challenges the factual sufficiency of the evidence to support the jury's verdict, and further contends that the trial court erred in (i) refusing to allow impeachment of a witness with a prior expunged conviction, (ii) failing to allow appellant to re-open the case with additional testimony after both sides had rested, and (iii) admitting appellant's statement. For the reasons that follow, we affirm the judgment of conviction.

## FACTS

In 2003, a grand jury indicted appellant for the 1995 murder of 92-year-old Jose Cantu. Cantu had resided at 1700 Riverview Street in Austin with his diabetic son, Jose Jr., who was

one of Cantu's ten adult children. Testimony at trial showed that the father and son had a close relationship and that Cantu cooked for and took care of his son.

At approximately 1 a.m. on October 6, 1995, Jose Jr. was awakened by sounds of screaming coming from his father's room. He thought at first that Cantu was having a nightmare. When he checked on his father, he found him on the floor bleeding. He thought his elderly father had fallen and injured himself. Jose Jr. immediately called his sister, Juventina Martinez, who was a nurse and lived nearby. He then called emergency services. The Cantus' neighbor, Rafael Monroy, was also awakened by a noise, heard Cantu's voice, and went over to the Cantu house to investigate. As he approached the back door, he noticed a light go on in Cantu's bedroom and observed window screens, as well as a knife laying underneath a screen, on the back porch. Monroy moved the screens but did not touch the knife. He found Cantu on the floor of his bedroom and heard Jose Jr. saying, "What happened, que paso, daddy, que paso, daddy, how hurt?" When Martinez arrived, she observed that Cantu was bleeding from what appeared to be stab wounds.

Emergency services arrived and transported Cantu to a hospital where he died from massive internal bleeding from one of the stab wounds that penetrated the left ventricle of his heart. Austin police officers arrived at the Cantu home and secured the crime scene. They found the window screens pulled off the windows and the knife. Although they found three fingerprints on the knife, in the years following the murder they were unable to identify the fingerprints or match them with a suspect.

In October 2002, following up on prior leads and the fingerprint evidence, investigators matched one of the prints found on the knife through a newly updated Automated

Fingerprint Identification System (AFIS). A thumbprint matched that of appellant who was then incarcerated on a charge of driving while intoxicated. In November 2002, the local newspaper reported appellant's arrest, stating that the fingerprint match led to his arrest for the 1995 murder. Shortly thereafter, one of the police officers involved in the case received a letter from an inmate offering information about the crime and later testifying at trial that appellant confessed the crime to him when they were incarcerated together.

Appellant testified on his own behalf. He denied that he had committed the crime or that he had discussed the crime with the informant inmate. Although at the time of his arrest appellant denied ever seeing the knife, he testified at trial that the knife belonged to a friend with whom he had lived. Appellant was convicted of capital murder and sentenced to life imprisonment.

## ANALYSIS

### Factual Sufficiency

Appellant first contends that the evidence was factually insufficient to support the verdict because the fingerprint, as the only physical evidence that linked appellant to the crime, was mishandled by the police and could not have been left at the murder scene due to the manner in which the crime occurred. Because (i) the knife was not identified initially by family members at the time of the murder, (ii) three prints were found on the weapon—only one of which was identified—and (iii) the evidence was "improperly handled" in 1995, appellant urges that the proof of guilt is "so obviously weak as to undermine confidence in the jury's determination" and the proof of guilt is "greatly outweighed by contrary proof." *See Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).

In a factual sufficiency review, we view the evidence in a neutral light and ask whether a jury was rationally justified in finding guilt beyond a reasonable doubt. *See Watson v. State*, 204 S.W.3d 404, 415 (Tex. Crim. App. 2006). We then determine whether the evidence supporting the verdict is so weak that the verdict is clearly wrong and manifestly unjust or whether the verdict is against the great weight and preponderance of the conflicting evidence. *Id*. We will not reverse a case on a factual sufficiency challenge unless we can say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict. *Id*. at 417. Under either review, the fact finder is the exclusive judge of the witnesses' credibility and the weight to be given to their testimony. *Cain v. State*, 958 S.W.2d 404, 408-09 (Tex. Crim. App. 1997).

The State offered extensive testimony about the knife, which the evidence showed was the murder weapon. Austin police officer Robert Jones first testified that he was dispatched to the crime scene at 1700 Riverview Street shortly after 1 a.m. to assist emergency services. He observed the window screens and the knife on the back porch. The neighbor, Rafael Monroy, also observed the screens and knife on the back porch.

Glen Unnasch, a latent print examiner for the Texas Department of Public Safety crime laboratory, testified that he was the supervisor of the latent print section of the laboratory with over thirty-three years of fingerprint identification experience with the DPS. Unnasch explained that after latent prints are lifted they can be photographed and digitized for preservation purposes. He testified that the preserved latent prints are then compared to a set of known impressions or entered into the AFIS for database searches. On October 29, 2002, the AFIS showed a possible match of the

4

knife print to appellant. Unnasch then identified the right thumbprint on the knife as appellant's right thumbprint. Unnasch testified that there were three fingerprints on the knife: a partial fingerprint and a partial palm print that could not be identified and, on the base of the blade, a right thumbprint, which Unnasch had "no doubt" matched appellant. The other two prints remained unidentified. Unnasch testified that the identified print was found on the knife where the metal blade joined the wooden handle, consistent with someone grasping the handle and having their thumb on the knife blade. Unnasch showed the jury the points of identification on the print and how he analyzed the print characteristics, and concluded that there was "no doubt in my mind" that the prints matched.

Unnasch also explained that the evidence had been improperly handled in 1995:

When the knife first came to the DPS lab was, I believe, in 1995. And there was an analyst in the section that this case was assigned to. She worked it, developed the latents, had them photographed. And then the photographed latents, since there were no suspects in the case, the photographed latents were sent to the AFIS section for a search of the database. And they were not hit, so the latent was not hit.

. . . And then in 1998 we were going to re-run—we had gotten some new software, and from time to time our AFIS technicians will pull old, unsolved cases and just rerun them. And that is what they did in this case. And they came up with a hit. No, they didn't come up with a hit then. They were going to rerun it, but they decide to go get the hard copy photograph and enter it again different ways, because over the period of years they gained experience of tracing the latents, free-hand tracing them. And so they went to the files to look for the photograph. And that entire file was missing. So that is when the supervisor at that time told the examiner that originally processed the knife to call APD and have them bring the knife back out to be rephotographed, which they did.

The fingerprint evidence was then photographed again and entered into the database. Unnasch subsequently discovered that the analyst who had originally processed the knife had taken the

photograph and negatives of the knife to her residence. It was determined that she was not properly handling evidence, and she was subsequently prosecuted. Various items of evidence, including the original photograph of the latent prints found on the knife, were turned over to DPS by the analyst's husband when a search warrant was obtained for her residence.

The State offered into evidence the original photograph of the print made in 1995 as well as the photograph that was made in 1998. Unnasch testified that the work performed by the analyst was done under the supervision of the photography department and that her conduct did not affect the work performed by the officers in identifying and matching the fingerprints. On cross-examination, Unnasch testified that the other two latent prints remained unidentified and that they were not of good quality.

Cantu's family members also testified about the knife. The knife was not identified by the family members questioned at the time of the murder. One daughter, Esperanza Cantu Rayos, had not been interviewed by the police in 1995. When the case was reopened, Rayos, a DPS employee, was interviewed. At trial, she testified that when she was interviewed she identified the knife as her father's knife. Because she prepared food every day in her father's kitchen as she waited for her children to arrive at his home from school, she recognized the knife as one her father used to cut meat taken from the freezer. She recognized the grooves on the top of the knife caused by Cantu hammering on the knife to cut frozen meat. And she recognized the tape he wrapped around the handle of the knife and the filing patterns placed on the knife from her father's use of a file in sharpening the knife. Based on its unique characteristics and her familiarity with her father and his

6

kitchen, Rayos positively identified the knife as belonging to her father.  She last saw the knife in her father's toolbox.  In closing argument, defense counsel challenged Rayos's credibility:

> You know that everybody in the family was asked about that knife, and you have to infer that nobody recognized it.  Nobody, not until seven years later in 2002 when [Rayos] identifies the knife.  Seven years after the fact.  Oh, that is my dad's knife, that's it.  We used it to cook.  He used it to cook, and I prepared the table.  What she made doesn't require the use of a knife.  Then, she finally admitted that the last time she saw that knife, the last time she saw the knife it was in the kitchen, and it was in a toolbox underneath that china cabinet.

In October 2002, after an update to the AFIS was installed, investigators decided to re-run the fingerprints from the knife.  The AFIS produced a match with appellant, who was then incarcerated on a DWI charge.  Appellant was interviewed at the Austin Police Department on November 5, 2002.  Appellant denied knowing Cantu and did not recognize Cantu's house, but stated he had walked through the area "thousands" of times.  Appellant also said that he had never seen the knife before.

Apart from the evidence regarding the knife, an inmate at the Del Valle detention facility, Carlos Lavernia, testified to conversations he had with appellant.  Lavernia contacted police after reading an article in the local newspaper on November 7, 2002, that discussed appellant's case and the fingerprint match that led to appellant's arrest for the 1995 murder.  Lavernia gave a statement to police and also testified at trial.  Testimony at trial shows that Lavernia came to the United States from Cuba as part of the Mariel Boatlift.  He pleaded guilty in 1983 to a charge of indecency with a child and was placed on probation.  In 1985, he was found guilty of sexual assault after being identified by a rape victim and was sentenced to 99 years in prison.

7

In 2000, DNA evidence exonerated Lavernia from the sexual assault, but he continued to be held in the Del Valle facility due to his immigration status and his previous guilty plea. In 2003, Lavernia sought relief from the indecency conviction in a habeas corpus proceeding. The 1983 conviction was also reversed and subsequently expunged.

Lavernia met appellant in 2001 when they were both incarcerated at the Del Valle correctional complex. Lavernia told police and later testified at appellant's trial that in December 2001 appellant told Lavernia that he had killed an old man to buy drugs, that the crime bothered him, and that he wanted to change his life. Lavernia made notes of his extensive conversation with appellant. After learning of appellant's arrest on television news and in a newspaper article, Lavernia contacted police, he testified, to ensure that the police would not incarcerate any other innocent person as he himself had been incarcerated.

Appellant urges that the evidence is too weak to support the State's burden of proof and that the verdict is so contrary to the overwhelming weight of the evidence as to be clearly unjust and wrong. Although Lavernia's statement, notes, and testimony at trial contain details of the crime, appellant argues that Lavernia gleaned the information from the newspaper article and the physical evidence at trial does not substantiate Lavernia's statement or the State's theory of the crime. Appellant disputes that the evidence supports that appellant was on drugs and needed drug money and that the knife, if it belonged to Cantu, was stored in a toolbox under the china cabinet. Appellant argued that the knife could not have been left out the night before, because the autopsy report showed that the food eaten by Cantu prior to his death did not require the use of a

8

knife. Appellant elicited testimony that Cantu's bedroom did not show signs that it was ransacked by intruders searching for money, and Cantu was found with $700 on him, along with jewelry, which was not taken.

Lavernia testified to appellant's detailed account about how appellant and an acquaintance, Jimmy Benavides, watched Cantu's house from the school across the street and then broke in to find money for crack cocaine because Benavides knew that Cantu received money every month. Numerous details of Lavernia's account were not in the newspaper but were corroborated by other evidence. Importantly, Lavernia testified that appellant committed the crime with Jimmy Benavides, who was not mentioned in the newspaper or television accounts but was the focus of the police investigation immediately after the crime occurred in 1995. Benavides lived in the neighborhood. Lavernia also stated that appellant told him that he took a screen from a window but then actually entered through a door in the kitchen. Again, this detail was not included in the newspaper article, but police initially focused on the kitchen window as the point of entry because the screen was removed and the window was open. Monroy also observed two screens and the knife on the back steps to the door leading to the kitchen, which he found unlocked.

Appellant told Lavernia that Cantu dressed "nicely" in suits and wore "1950's style" hats, which Juventina Martinez also described to the jury. Martinez testified to the proximity of the school across the street, which was related by Lavernia but not included in the newspaper article. Lavernia testified that appellant and Benavides did not find money under the mattress, but found money in Cantu's shoes. The newspaper article did not mention anything about shoes, but family members told police that Cantu kept money in his shoe at night. When the police

9

searched Cantu's shoes after the murder, they found no money. Lavernia's statement indicates that appellant and Benavides expected the money to be under the mattress; there was testimony that money was missing.

Lavernia's statement and testimony also revealed other facts not found in press accounts and corroborated by other evidence: appellant was friends with Jimmy Benavides, who lived a few houses from Cantu; Benavides and appellant did various drugs together, and appellant both smoked crack and used a needle to inject some type of drug; appellant had seen "the old man" before when he walked to church on Sundays; "the old man" wore nice clothes, with suspenders and a 1950s style hat; on the night of the murder, appellant and Benavides went to Martin Middle School and smoked crack behind the school while they watched the old man's house, waiting for him to go to sleep; and appellant stabbed Cantu a lot of times, and then he and Benavides left the house immediately.

Appellant urges that it is improbable that he found the knife used in the murder in the toolbox. But there was no testimony as to the location of the knife prior to the murder—only that it had appellant's thumbprint on it. The jury was entitled to believe Rayos's testimony over that of appellant concerning the identification of the knife.

Appellant's other challenges to the evidence go to the credibility of the witnesses' testimony as well. The weight to be given contradictory testimonial evidence is within the sole province of the jury. *See Cain*, 958 S.W.2d at 408-09. The jury was in the best position to evaluate the credibility of these witnesses, and our factual-sufficiency jurisprudence requires us to afford due deference to the jury's determinations. *See Marshall v. State*, No. AP-75,048, 2006

10

Tex. Crim. App. LEXIS 2444, at *15 (Tex. Crim. App. Dec. 20, 2006). We find that the evidence is not so weak that the verdict is clearly wrong and manifestly unjust and that the verdict is not against the great weight and preponderance of the evidence. Consequently, we hold that the evidence is factually sufficient to support appellant's conviction, and we overrule appellant's first point of error.

### *Impeachment with Expunged Conviction*

In his second point of error, appellant complains that the trial court improperly refused to allow him to impeach Carlos Lavernia, the jailhouse informant, with a 1983 guilty plea to a charge of indecency with a child which conviction was expunged in 2003. Appellant urges that the failure of the trial court to allow Lavernia to be impeached with the prior expunged conviction left a false impression in the mind of the jurors that Lavernia was being held illegally and was, in fact, "just a good citizen." The State responds that the expunged conviction is not admissible evidence.

Convictions for crimes involving felonies may be admissible to impeach a witness's credibility for truthfulness if the probative value outweighs its prejudicial effect. *See* Tex. R. Evid. 609(a). Rule 609(a) provides that evidence that the witness has been convicted of a crime shall be admitted "if elicited from the witness or established by public record." *Id.* A witness's credibility may not be impeached by evidence of conviction of a felony if ten years have elapsed since the date of conviction or release from confinement, unless the court determines that, in the interest of justice, the probative value of the conviction, supported by specific facts and circumstances, substantially outweighs its prejudicial effect. Tex. R. Evid. 609(b).

11

As a preliminary matter, the evidence is inadmissible because the code of criminal procedure prohibits the "use of the expunged records and files for any purpose." Tex. Code Crim. Proc. Ann. art. 55.03(1) (West Supp. 2006). Such evidence may not be elicited from the witness Lavernia—or any other witness. *See id.*; Tex. R. Evid. 609(a). Article 55.03(3) specifies that "the person arrested or any other person, when questioned under oath in a criminal proceeding about an arrest for which the records have been expunged, may state only that the matter in question has been expunged." Tex. Code Crim. Proc. Ann. art. 55.03(3). Nor may the evidence be established by public record. *See* Tex. R. Evid. 609(a). When an order of expunction is final, the maintenance, dissemination, or use of expunged records is prohibited. Tex. Code Crim. Proc. Ann. art. 55.03(1). Public records relating to expunged convictions may not be maintained, released, disseminated or otherwise used. *Id.* art. 55.04(1) (West Supp. 2006). Thus, the evidence is inadmissible because it may not be adduced from any competent source.

Moreover, for evidence to be admissible for purposes of impeachment, rule 609(a) requires evidence of a "conviction." Tex. R. Evid. 609(a). Where a conviction is not final or has been reversed, Texas courts have consistently held that the conviction cannot be used for impeachment purposes. *See, e.g.*, *Poore v. State*, 524 S.W.2d 294, 296 (Tex. Crim. App. 1975); *Baker v. State*, 520 S.W.2d 782, 783 (Tex. Crim. App. 1975); *Ringer v. State*, 129 S.W.2d 654, 656 (Tex. Crim. App. 1938). Thus, pendency of an appeal renders evidence of a conviction inadmissible. Tex. R. Evid. 609(e). A conviction that has been reversed is not a final conviction and cannot be used for impeachment. *Poore*, 524 S.W.2d at 296. Nor is a case that has been dismissed a final

12

conviction under rule 609. *U.S.A. Precision Machining Co. v. Marshall*, 95 S.W.3d 407, 410 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).[1]

Although appellant correctly argues that great latitude should be allowed in cross-examining witnesses to reveal possible bias, prejudice, or self-interested motives to falsify testimony, it is likewise true that the burden of showing that the evidence is admissible and relevant on the issue of bias is on its proponent. *Chambers v. State*, 866 S.W.2d 9, 26-27 (Tex. Crim. App. 1993); *Janecka v. State*, 739 S.W.2d 813, 830 (Tex. Crim. App. 1987). The parameters of cross-examination for the showing of bias rest in the sound discretion of the trial judge. *Chambers*, 866 S.W.2d at 27. As rule 609 calls on the judge to balance the probative value of the evidence with its prejudicial effect, the trial judge must weigh and assess any undue prejudice, embarrassment, harassment, confusion of the issues, and undue delay. *Id.* We may not reverse unless the appellant demonstrates a clear abuse of discretion. *Id.*; *see also Montgomery v. State*, 810 S.W.2d 372, 379 (Tex. Crim. App. 1990).

Lavernia testified outside the presence of the jury that he arrived in the United States from Cuba in 1980. In 1983, Lavernia pleaded guilty to a charge of indecency with a child and was placed on probation. In 1985, he was convicted for sexual assault and was sentenced to 99 years in prison. After DNA evidence absolved Lavernia of the sexual assault charge in 2000, he remained in detention because of an immigration hold based on the conviction for indecency with a child. In

---

[1] *See also Juneau v. State*, 49 S.W.3d 387, 389 (Tex. App.—Fort Worth 2000, pet. ref'd) ("Deferred adjudication is not a conviction, and denying impeachment on this basis does not violate a defendant's constitutional right of confrontation."); *Foster v. State*, 25 S.W.3d 792, 795 (Tex. App.—Waco 2000, pet. ref'd) (juvenile adjudication not a conviction under Rule 609(a) and prohibited by 609(d)).

response to questioning, Lavernia testified that after the sexual assault charge was dismissed, he filed a writ of habeas corpus asserting that he had not been properly admonished as to the immigration consequences of his plea of guilty to the indecency charge. *See* Tex. Code Crim. Proc. Ann. art. 11.07 (West 2005). Although no records were introduced into evidence to establish the chronology of events, the conviction was evidently reversed and later expunged. Because the conviction was expunged, the circumstances of the conviction are unknown and appellant, as the proponent of the evidence, failed to establish its admissibility.

Even if the exclusion of the evidence were erroneous, we conclude that it is harmless because of the other evidence with which the court permitted appellant to impeach Lavernia. Error in the admission or exclusion of evidence is subject to a harm analysis. *See* Tex. R. App. P. 44.2; *see also Johnston v. State*, 145 S.W.3d 215, 224 (Tex. Crim. App. 2004) (applying harmless error analysis to trial court's admission of evidence); *Hepner v. State*, 966 S.W.2d 153, 160 (Tex. App.—Austin 1998, no pet.) (same). A violation of the evidentiary rules that results in the exclusion of evidence is nonconstitutional error. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). Any nonconstitutional error that does not affect substantial rights may not provide a basis for reversal. Tex. R. App. P. 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King*, 953 S.W.2d at 271. A criminal conviction should not be overturned for nonconstitutional error if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but slight effect. *Id.*

14

The trial court permitted appellant to impeach Lavernia with his presence in jail on an immigration hold. The jury heard that appellant had come to the country illegally during the Mariel Boatlift in 1980. The jury also heard that Lavernia was in prison with appellant in 2001. Defense counsel questioned Lavernia about his report on a second inmate who was never charged for the crime Lavernia reported. Upon consideration of the trial court's exclusion of the expunged conviction in the context of the entire record and the evidence of appellant's guilt, we conclude that any error is harmless.

We hold that the trial court did not abuse its discretion by excluding evidence of a conviction that had been dismissed and expunged and that, if error, the exclusion was harmless error. We overrule appellant's second point of error.

### *Motion to Reopen Evidence*

In his third issue, appellant argues that the trial court abused its discretion when it did not allow him to reopen the evidence after the parties had rested. By statute, a trial court must allow testimony to be introduced at any time before argument "if it appears that it is necessary to a due administration of justice." Tex. Code Crim. Proc. Ann. art. 36.02 (West 1981). The court of criminal appeals has construed the phrase "due administration of justice" to mean that the trial court should allow a case to be reopened if the proposed evidence would materially change the case in the proponent's favor. *Peek v. State*, 106 S.W.3d 72, 79 (Tex. Crim. App. 2003). The proffered evidence must be more than just relevant; it must actually make a difference in the case. *Id.* We review this decision for an abuse of discretion. In determining whether the trial court abused its discretion, we do not substitute our judgment for that of the trial court. *Montgomery*, 810 S.W.2d

15

at 379-80. The purpose of our review is to determine whether the trial court's decision was made without reference to any guiding rules or principles of law, that is, whether the decision was arbitrary or unreasonable. *Id.* An abuse of discretion occurs when a trial court's decision is so clearly wrong as to lie outside the zone of reasonable disagreement. *Id.* at 391 (op. on reh'g).

Both parties rested at the close of evidence on the fourth day of trial. The charge conference was held outside the presence of the jury. The jury was about to be released for the evening, to come back the next day for closing arguments, when the following discussion occurred:

| | |
|---|---|
| [Defense Counsel]: | Your Honor, respectfully, my client has asked me to reopen the Defense case-in-chief. He said he has some other things that he needs to tell the jury, and he would like the opportunity to do so tomorrow morning at 9 o'clock. |
| [Court]: | That is going to be automatically refused unless you tell me what the subject matter is and I find it relevant. He was given pretty much latitude on his answering questions. It was not particularly pleasing to the Court, but the State, being so kind to you, didn't object. |
| [Defense Counsel]: | Yes, sir. |
| [Court]: | No, without some pecularized [sic] need, that will be refused. |
| [Defense Counsel]: | Judge, just to state the specific need, he has stated to me here since we have rested the case-in-chief that he needed to clarify certain matters, present additional matters to the Court with regard to who and why he thought somebody else had done this, a man by the name of Eduardo Rangel, and he feels that he wasn't clear enough to the jury and would like the opportunity to present those matters to the jury in a more clear and succinct fashion, Your Honor. |
| [Court]: | Reviewing his testimony in mind, I am not going to reopen. It's denied. |

16

At trial, appellant had departed from his statement following his arrest in which he denied ever seeing the knife. He testified that he recalled that the knife belonged to Miguel Felan, a person with whom appellant lived. Testifying through an interpreter, appellant testified:

Yeah, it belongs to Miguel Felan, and that is the knife of Miguel Felan. And probably the other two fingerprints, this one belongs to Mike or one of the others that lived there, because we all cooked and we never washed the dishes, because we were single. We don't have no womans in the house.

Appellant explained that he was a victim and that someone in the house decided to use the knife: "That is the only explanation." Appellant was sure that the handle on the knife was broken and that "Mike" had taped it. Appellant testified that Felan had died since the murder. Appellant also identified others who lived in the house, and whether they worked and were "seen" with money. Appellant testified in response to his counsel's questions on redirect examination:

[Counsel]:          Did Guillermo Rangel work?

[Appellant]:        Yes, sir.

[Counsel]:          What type of work did he do?

[Appellant]:        He works in anything. But he always working. He loves to go to the cantina like I used to.

[Counsel]:          How about Eduardo Rangel?

[Appellant]:        Nope.

[Counsel]:          He did not work?

[Appellant]:        No.

[Counsel]:          Did you ever see him with money?

17

| [Appellant]: | Yep. |
| [Counsel]: | How would he make money, sir? |
| [Appellant]: | Well, I guess doing the same thing like he was doing in Mexico, because I remember a few times he told me, he impressed me, he impressed to Mike, my Miguel, he was trying to sell things from houses like stereos and stuff like that, like electronical stuff from houses. I know it was from houses because I know, believe that way. |
| [The Interpreter]: | Appliances is what he is trying to say. |
| [Counsel]: | You would see Lalo or Eduardo—the nickname was Lalo—with these appliances you believed to be stolen from houses? |
| [Appellant]: | Yeah, I don't think anybody give it to him. |

Defense counsel then passed the witness to the prosecutor for re-cross-examination.

Although defense counsel urged that the testimony was material, appellant did not show that it would have materially changed the outcome in his favor or do anything more than clarify appellant's suspicions—and speculation—about Rangel. Because appellant failed to make the requisite showing as to what the evidence was, the trial court properly applied the materiality standard to the case. *See Peek*, 106 S.W.2d at 79. We cannot say that the evidence would have materially changed the case in appellant's favor as required by *Peek* or that the trial court abused its discretion when it did not allow appellant to reopen the evidence after he rested. We overrule appellant's third point of error.

18

*Timeliness of Production of Recorded Statement*

In his fourth point of error, appellant contends that the trial court erred in allowing the admission of appellant's videotaped statement made when he was questioned in November 2002 about Cantu's murder because the State failed to provide the statement to his counsel in a timely manner. Specifically, appellant complains that the State introduced his statement that he had never seen the knife before and that counsel received the statement on May 26, less than twenty days before appellant's trial began on June 8, 2005. The State responds that it informed defense counsel of the existence of the recorded statement and provided him access to the statement in discovery.

The code of criminal procedure provides that no oral statement of an accused made as a result of custodial interrogation is admissible at trial unless "not later than the 20th day before the date of the proceeding, the attorney representing the defendant is provided with a true, complete, and accurate copy of all recordings of the defendant made under this article." Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a)(5) (West 2005). Reasoning that the legislature could have used the word "served," "given," or "delivered," the court of criminal appeals held that the word "provide" means to "make available or furnish." *Lane v. State*, 933 S.W.2d 504, 516 (Tex. Crim. App. 1996). The court explained, "so long as defense counsel is informed of the existence of the recording and is permitted reasonable access to a copy, the purpose of § 3(a)(5) has been met." *Id.*; *Tigner v. State*, 928 S.W.2d 540, 542-44 (Tex. Crim. App. 1996) (explaining that the rationale of this provision is to guarantee defense counsel an opportunity to examine the recording to ensure no alterations were made).

In *Lane*, the appellant claimed he was not provided copies of taped confessions because the copies were never served on defense counsel. 933 S.W.2d at 514. The State argued that, in response to a standard discovery order, the State made discovery available in their office. *Id.* The court found that defense counsel was placed on notice of the existence and contents of the recordings, and that the recordings were made available to him. *Id.* at 516.

Out of the presence of the jury, the court heard argument and representations of counsel. Defense counsel stated that he was "surprised" the State offered appellant's statement, but not that he was unaware of the statement. He did not deny having access to and inspecting the district attorney's file and police report or that the file contained reference to the statement. In particular, the probable cause affidavit underlying the appellant's arrest states that appellant was brought to the police department for an interview and that he made a number of statements, including the statement that his fingerprints would not be on the knife. Defense counsel acknowledged that he was given access to his client's file at the district attorney's office, but complained that the statement was not in the file: "I did many, many moons ago go and see the State's file, the police report as it stood at that time. It has since been supplemented, but the State didn't apparently get my client's statements until fairly recently." The prosecutor disputed counsel's claim and asserted that appellant's statement had been available for counsel's review at the prosecutor's office. At a pretrial hearing on January 11, 2005, five months prior to trial, defense counsel acknowledged that he had been told of the existence of the statements: "[The prosecutor] actually has indicated to me that the defendant did make a statement that I am unaware of. It doesn't mention it in the police reports anywhere, and I haven't seen it anywhere else." Finding that the prosecutor made the discovery

available, that counsel "had adequate opportunity outside of the 20 days to have it and look at," and that appellant suffered no harm, the trial court allowed the admission of the statement.

Nothing in the record indicates that defense counsel was denied access to the recorded statement at any time prior to trial.[2] Where, as here, defense counsel was apparently aware of the existence of appellant's statement, the State is required only to "permit reasonable access" to a copy. *See id.* The trial court found, and the record supports the trial court's conclusion, that the State met the requirements of article 38.22. The record also supports the trial court's decision to allow the admission of the statement. We overrule appellant's fourth point of error.

## CONCLUSION

Having overruled appellant's points of error, we affirm the trial court's judgment.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Pemberton

Affirmed

Filed:   January 19, 2007

Do Not Publish

_____

[2] Appellant was represented by another attorney prior to January 2004. However, the attorney who represented appellant at trial had from that date until the trial in June 2005 to obtain access to appellant's file. The standing discovery order was executed on January 11, 2005.

21