**AFFIRM; and Opinion Filed January 30, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

No. 05-13-00405-CR

**SRIHARI AVULA, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 380th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 296-80285-2012**

# OPINION

Before Justices Fillmore and Thomas, Retired[1]
Opinion by Justice Fillmore

A jury found appellant Srihari Avula guilty of driving while intoxicated (DWI) with a child passenger. *See* TEX. PENAL CODE ANN. § 49.045(a) (West 2011).[2] The trial court assessed punishment of one hundred eighty days' confinement, suspended the sentence, and placed Avula on two years' community supervision. In seven points of error, Avula contends there was no admissible proof at trial that a child passenger was present in Avula's vehicle; the prosecutor's comments during voir dire unfairly prejudiced the jury panel; the prosecutor asked the jury panel to commit to a verdict of guilty if the State proved only one of four elements of the offense; there

---

[1] The Honorable Linda Thomas, Chief Justice of the Court of Appeals for the Fifth District of Texas—Dallas, Retired, sitting by assignment. Justice Michael O'Neill was a member of the original panel and participated in the submission of this case; due to his retirement, he did not participate in the issuance of this opinion. *See* TEX. R. APP. P. 41.1(b).

[2] Section 49.045(a) of the penal code provides that "[a] person commits an offense if (1) the person is intoxicated while operating a motor vehicle in a public place, and (2) the vehicle being operated by the person is occupied by a passenger who is younger than 15 years of age." TEX. PENAL CODE ANN. § 49.045(a). The offense is a state jail felony. *Id.* § 49.045(b).

was insufficient evidence that Avula was intoxicated; the trial court erred in permitting the State to use an exhibit without a proper predicate; and cumulative error necessitates reversal. We affirm the trial court's judgment.

**Background**

Robert McKenna, a 9-1-1 dispatcher for the Frisco Police Department, testified that shortly before 8:00 p.m. on October 21, 2011, a call was received reporting a reckless and possibly intoxicated driver of a vehicle. An audio recording of the 9-1-1 call was played for the jury. On the recording, the individual making the report provided the license number of a silver Toyota Camry he was following. The caller stated his belief that the driver of the vehicle may be intoxicated. He described the vehicle as weaving, moving erratically, and changing speed, and he stated the vehicle had almost hit the curb numerous times. McKenna dispatched police officers to the location identified by the 9-1-1 caller, but he believed the vehicle could not be located.

Sergeant Ryan Moore of the Frisco Police Department testified that upon driving away from the police station at 8:27 p.m. on October 21, 2011, he was behind a gray vehicle. Traveling on a two-lane northbound road, he saw the vehicle strike the curb on the left and cross the lane divider on the right more than once. The vehicle increased its speed to seventy miles per hour in a fifty-miles-per-hour speed zone. Moore activated his emergency overhead lights and stopped the vehicle. Moore identified the driver of the vehicle as Avula. Moore asked Avula the reason for his driving behavior, and Avula said he was sorry. Moore noted there was a small child in a car seat in the middle position of the back seat of Avula's vehicle. Moore returned to his police vehicle to conduct a routine license check, and he received notification from the police department dispatcher of the earlier 9-1-1 call. While speaking with the dispatcher, Moore noted

Avula making erratic movements and striking himself in the head with his open hand and fist. Moore requested the dispatcher to send another patrol unit as backup.

Upon arrival at the scene, Officer Thomas Andrew Connell and Corporal Bardwell[3] of the Frisco Police Department accompanied Moore to Avula's vehicle, and Moore asked Avula to step out of his vehicle. When answering Moore's questions, Moore smelled alcohol on Avula's breath. Avula originally denied he had been drinking alcohol, but after Moore advised Avula that he smelled alcohol on his breath, Avula stated he had a couple of drinks. Based on the manner in which he had seen Avula's car driven, the odor of alcohol on Avula's breath, and Avula's admission he had been drinking, Moore decided to perform standardized field sobriety tests on Avula. Bardwell requested that Moore permit Connell to perform the standardized field sobriety tests because Connell was in training and Bardwell wanted Connell to have field experience. Moore permitted Connell to conduct the standardized field sobriety tests.

Connell testified that on October 21, 2011, he was a patrol officer in the third and final phase of his field training, which entailed acting independently as a police officer accompanied by a supervisor. Bardwell was Connell's supervisor on October 21, 2011. Connell was dispatched to provide backup to Moore on a traffic stop. Upon arrival at the scene, Moore informed Connell he had observed the suspect engaging in the traffic violations of failing to maintain the traffic lane, striking a curb, and speeding. Moore told Connell that the behavior of the driver seemed odd and abnormal. The police officers decided to administer the standardized field sobriety tests. Connell's police academy training included a week of instruction by National Highway Traffic Safety Administration (NHTSA) instructors on how to determine whether a person is driving while intoxicated. Connell received his State certification to administer the standardized field sobriety tests when he graduated from the police academy in

___

[3] Corporal Bardwell's first name is not included in the record.

May 2011. This was Connell's second DWI investigation. The other investigation occurred during the second phase of his field training. Connell testified he had conducted more standardized field sobriety tests since he performed Avula's tests, and he was "smoother" in conducting those tests than he was at the time he tested Avula.

Connell testified that the standardized field sobriety tests are a combination of three tests developed by the NHTSA to determine whether a driver has the cognitive and physical ability to safely operate a vehicle. In administering each of the tests, one looks for specific areas that indicate the test is passed or failed. A certain number of areas failed in each test is a "decision point" indicating the test subject met the criteria for being intoxicated and the test administrator should proceed to the next stage of testing. The first test is the horizontal gaze nystagmus (HGN) test. HGN is the involuntary jerking of the eyes when they move along a horizontal plane and can be caused by ingestion of central nervous system depressants such as alcohol, marijuana, medications, or inhalants.

Connell testified that before administering the HGN test, bright lights of police vehicles are turned off and officers do their best to ensure the test subject is not facing oncoming traffic lights. Connell agreed that the HGN test has to be performed in the exact manner in which he was trained or the results of test could be compromised. The NHTSA manual indicates that if the person performing the HGN test deviates from standard test procedures, the results are compromised. Connell testified that at the time Avula's HGN test was administered, the strobe lights of the patrol vehicle were turned off and Avula was facing the intersection of Cotton Gin Road and both the North Dallas Tollway and the access road. Traffic was not coming toward Avula, but instead was passing from left to right on the North Dallas Tollway and the access road, and the traffic was therefore in the left and right fields of Avula's vision. Connell was trained to place an HGN test subject in the most secure and optimal position for administering

the test, and in Connell's opinion, he placed Avula in the position that would best ensure his safety.

The police videotape of the traffic stop was admitted into evidence and played for the jury. On the videotape, Avula acknowledges he had been drinking. The videotape also included the standardized field sobriety tests administered by Connell. On the videotape, the strobe lights of the patrol vehicle were turned off. A few vehicles passed at some distance from the scene during the administration of the HGN test, but no vehicles passed adjacent to the scene in a manner causing headlights to shine directly in Avula's face during administration of the HGN test. On the videotape, Avula's eyes are not visible during the HGN test. Connell testified that an HGN test could have been performed in the intoxilizer room of the Frisco jail, and the jury could have had a better vantage point to see Avula's eyes during an HGN test performed in the intoxilizer room, however Avula was not transported to the intoxilizer room for HGN testing because environmental factors, such as inclement weather, did not require indoor testing.

Connell testified that when the HGN test was administered, Avula exhibited positive response to each aspect of the test. First, Connell checked for "equal tracking," or ability of the eyes to follow the stimulus in a smooth pattern without involuntary eye jerking. Connell observed a lack of "smooth pursuit" in both of Avula's eyes. Second, Connell performed an aspect of the test referred to as "distinct and sustained nystagmus at maximum deviation." This portion of the test involved positioning the stimulus at "maximum deviation," and testing for jerking eye movement when the eye is "looking all the way to one side." Connell observed jerking movement in both of Avula's eyes. The third part of the HGN test involved moving the stimulus from center vision to about a forty-five degree angle while checking for eye jerking. Connell observed jerking in one of Avula's eyes. In other words, Connell observed five of a possible six "clues" while administering Avula's HGN test.

Having reached a decision point on the HGN test, Connell believed Avula was a candidate to continue with the walk-and-turn standardized field sobriety test, a divided-attention test of cognitive functioning and ability to reason as well as physical functioning and balance. There are eight clues on the walk-and-turn test, and the decision point is two clues. Connell observed four signs of intoxication in administering the walk-and-turn test with Avula starting too soon, stepping off the line during the instruction phase, making an improper turn to his right, and taking an incorrect number of steps. Connell determined Avula was a candidate for the next standardized field sobriety test, the one-legged stand test, a divided attention test involving cognitive and physical components. There are four possible clues of intoxication on this test, and the decision point is two clues. Connell observed two clues of intoxication when administering this test. Based on the totality of the circumstances, including Avula's performance on the standardized field sobriety tests, conduct of Avula observed by Connell, and conduct of Avula described to Connell by Moore, including Moore's statement he smelled alcohol on Avula's breath, Connell formed the opinion that Avula was intoxicated and did not have the normal use of his mental or physical faculties while driving a motor vehicle. Avula was placed under arrest.

The child sitting in the car seat in Avula's vehicle is named T.A.[4] A certified copy of T.A.'s birth certificate was admitted in evidence, indicating T.A. was born on April 28, 2010. Moore testified that T.A. was one and one-half years of age on October 21, 2011. Moore obtained the phone number of Avula's wife and T.A.'s mother and telephoned her to come to the scene to pick up T.A.

The jury also viewed the police videotape of Avula taken in the intoxilizer room of the Frisco jail following his arrest. On the videotape, Avula answered questions of a Frisco police

---

[4] To protect the identity of the minor, we identify him by his initials.

officer. Avula stated he last drank alcohol at 3:00 or 4:00 p.m., consisting of two shots of tequila, and he last ate food around 3:00 p.m. Avula told the police officer he was not ill, had not been recently injured, was not under a doctor's care, and did not have a blood disease or diabetes. Avula voluntarily agreed to provide a blood sample, and he was transported from the Frisco jail to Centennial Medical Center where Nurse Karen Holzer performed the blood draw. Holzer testified she performed the blood draw at 9:55 p.m.

Christopher Youngkin, a forensic scientist at the Texas Department of Public Safety Crime Laboratory in Garland, Texas, testified that he was asked by the Frisco Police Department to analyze a blood sample from Avula. The crime lab received Avula's October 21, 2011 blood sample on November 10, 2011. He retrieved the blood sample from a refrigerator at the crime lab on November 17, 2011 and performed a blood alcohol analysis of the blood on November 18, 2011. Youngkin testified regarding the manner in which he performed the blood analysis. Youngkin's Alcohol Analysis Laboratory Report on the blood alcohol concentration (BAC) in Avula's blood sample was admitted into evidence. Avula's blood sample contained .18 grams of alcohol per 100 milliliters of blood. Youngkin testified that alcohol diminishes a person's mental ability and inhibits a person's physical ability to operate a motor vehicle. In his opinion, a person with a .18 BAC would not be able to safely operate a motor vehicle.

Youngkin testified that retrograde extrapolation is a process for calculating a person's BAC at a point in time prior to the blood draw. Some amount of alcohol would have dissipated from Avula's blood between the time he was stopped by Moore and the time his blood was drawn. Based on retrograde extrapolation, Youngkin testified it was possible that Avula had a .21 BAC at the time he was stopped by Moore. For a male weighing approximately 175 pounds, it would require approximately eleven drinks to reach a BAC of .21. An individual with a BAC range of .18 to .3 could exhibit signs of confusion, disorientation, mental confusion, dizziness,

exaggerated emotional states, disturbances of vision and of perception of color, form, motion, and dimension, an increased pain threshold, increased muscular incoordination, staggering, slurred speech, apathy, and lethargy. Youngkin testified that a person hitting himself in the head as a result of a traffic stop could be a demonstration of an exaggerated emotional state of rage, and a vehicle driver hitting the curb multiple times and failing to maintain travel in a single lane of traffic could be the result of a disturbance of vision and perception or a lack of muscular coordination.

A jury convicted Avula of driving while intoxicated with a child passenger. *See* TEX. PENAL CODE ANN. § 49.045. The trial court assessed punishment of one hundred eighty days' confinement, suspended the sentence, and placed Avula on two years' community supervision. Avula's motion for new trial was overruled by operation of law. He filed this appeal of his conviction.

**Evidence of the Age of the Child Passenger**

To prove the offense of driving while intoxicated with a child passenger, the State must prove the vehicle operated by the intoxicated defendant in a public place was occupied by a passenger who was younger than fifteen years of age. TEX. PENAL CODE ANN. § 49.05(a). In his first point of error, Avula contends his conviction should be reversed because there was no admissible proof at trial that a child passenger was present in Avula's car. Avula acknowledges he did not object to admission of the child's birth certificate into evidence. However, he argues it was fundamental error for the trial judge to admit the child's birth certificate into evidence because the birth certificate was inadmissible hearsay.

Generally, for a complaining party to preserve error for appellate review, the record must reflect that the party raised the issue with the trial court in a timely and specific request, objection or motion. TEX. R. APP. P. 33.1(a)(1). Assuming for the sake of argument that the

challenged evidence is, in fact, hearsay, admission of hearsay evidence is not fundamental error that can be raised for the first time on appeal. *See* TEX. R. APP. P. 44.2(b); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998) (error in admission of evidence constitutes nonconstitutional error); *Moore v. State*, 935 S.W.2d 124, 130 (Tex. Crim. App. 1996) ("[A]ll existing authority holds the admission of hearsay must be preserved with a timely and specific objection to the evidence."); *see also Fernandez v. State*, 805 S.W.2d 451, 455–56 (Tex. Crim. App. 1991) (failure to timely object waives error, and hearsay admitted without objection is probative evidence).

Because Avula failed to object to admission of the child's birth certificate at trial, he failed to preserve this point of error for appeal. Accordingly, we resolve Avula's first point of error against him.

### Prosecutor's Comment During Voir Dire

In his second point of error, Avula contends his conviction should be reversed under fundamental error analysis because the prosecutor made a comment during voir dire regarding a possible effect of the jury's verdict that unfairly prejudiced the panel. Avula contends the prosecutor's comment could have resulted in the venire panel assuming that a conviction would result in Avula receiving treatment for substance abuse, "which the jury could have logically concluded would have benefited" Avula and, accordingly, the conviction must be reversed.

During voir dire, the prosecutor asked the venire panel members whether they, a close friend, or a relative had been arrested for, charged with, or convicted of a DWI charge. A venire panel member responded that his brother-in-law's DWI case was pending, stating "I think he's still in the process, but he's been going through a lot of recovery, going through Alcoholics Anonymous." The prosecutor stated to the venire panel member, "You've seen the rehabilitation

portion of that, and that ultimately, maybe, if that wouldn't have happened, he never would have gotten the help that he needs," and the venire panel member responded, "Absolutely."

Avula did not object at trial to the purportedly objectionable comment by the prosecutor, and he now asserts on appeal the comment amounted to fundamental error. Yet appellant provides no argument explaining how the prosecutor's comment is a violation of a "waivable-only" right or denial of an "absolute systemic requirement" warranting treatment as fundamental error. *See Saldano v. State*, 70 S.W.3d 873, 886–87 (Tex. Crim. App. 2002). Further, appellant cites to no authority concluding any similar voir dire comment by the prosecution constitutes fundamental error.

The prosecutor in this case did not question the venire panel members about their views on the benefit of rehabilitation that could result from a conviction. The prosecutor merely inquired about whether venire panel members, their friends, or their relatives, had previously been arrested for, charged with, or convicted of DWI. The prosecutor's question was a proper voir dire question because it sought "to discover a juror's views on an issue applicable to the case." *Samaripas v. State*, No. PD-135-13, 2014 WL 5247434, at *4 (Tex. Crim. App. Oct. 15, 2014) (citing *Barajas v. State*, 93 S.W.3d 36, 398 (Tex. Crim. App. 2002)). It was a venire panel member's response to the prosecutor's question that first raised recovery and rehabilitation as a possible consequence of a DWI arrest. The prosecutor simply responded to the venire panel member's answer by commenting that if the DWI arrest had not occurred, the panel member's brother-in-law might not have received needed help. The venire panel member then readily agreed with the prosecutor's comment. This is not the gist of fundamental error.[5] Fundamental error is error "calculated to injure the rights of the appellant to the extent that he has not had a

---

[5] Indeed, rehabilitation has long been recognized as a legitimate goal of penal sanctions. *See Meadoux v. State*, 325 S.W.3d 189, 195 (Tex. Crim. App. 2010) (citing *Graham v. Florida*, 560 U.S. 48, 49 (2010)).

fair and impartial trial." *Ross v. State*, 487 S.W.2d 744, 745 (Tex. Crim. App. 1972). The prosecutor's comment did not rise "to such a level as to bear on the presumption of innocence or vitiate the impartiality of the jury," *see Jasper v. State*, 61 S.W.3d 413, 421 (Tex. Crim. App. 2001), and it is not fundamental error of constitutional dimension.

We conclude the complained-of comment of the prosecutor during voir dire was not fundamental error, and Avula's failure to object to the purportedly improper comment by the prosecutor waived the error. We resolve Avula's second point of error against him.

### Request for Jury Panel's Commitment

In his third point of error, Avula contends his conviction should be reversed because during voir dire the prosecutor asked the panel to commit to a verdict of guilty if the State proved only one of four elements of the offense—that Avula was intoxicated. The State responds that the prosecutor did not attempt to commit the jurors to convict based solely on the element of intoxication, but rather properly questioned the jurors regarding their ability to convict based on any of the three definitions of intoxication.

As noted above, generally a complaining party preserves error for appellate review by making a timely and specific request, objection, or motion in the trial court. *See* TEX. R. APP. P. 33.1(a)(1). *See Halprin v. State*, 170 S.W.3d 111, 120 (Tex. Crim. App. 2005) (appellant who did not object to purportedly improper commitment questions failed to preserve any appellate claim they were improper); *see also Montgomery v. State*, 198 S.W.3d 67, 74 (Tex. App.—Fort Worth 2006, pet. ref'd) (appellant did not object to allegedly improper commitment question until after venire member had answered question; appellant failed to preserve this complaint for appellate review). Because Avula failed to object at trial, the alleged commitment questions must rise to the level of fundamental error to be preserved for appeal. *See Cade v. State*, 795 S.W.2d 43, 44 (Tex. App.—Houston [1st Dist.] 1990, pet. ref'd).

During voir dire, the prosecutor informed the venire panel that to convict Avula of the charged offense, the State was required to prove beyond a reasonable doubt that Avula was intoxicated while operating a motor vehicle in Collin County, Texas, and that while he was operating the vehicle, he had a passenger who was under fifteen years of age. The prosecutor informed the jury of three statutory definitions of intoxication: not having the normal use of mental faculties due to the introduction of alcohol, a drug, or a controlled substance; not having the normal use of physical faculties because of the introduction of alcohol, a drug, or a controlled substance; or having an alcohol concentration of .08 or greater. *See* TEX. PENAL CODE ANN. § 49.01(2) (West 2011) (definitions of intoxication); *Bagheri v. State*, 119 S.W.3d 755, 762 (Tex. Crim. App. 2003) (definitions of intoxication in penal code section 49.01(2) set forth alternate means of committing one offense rather than setting forth separate and distinct offenses). The prosecutor explained to the venire panel that the jurors did not have to agree on which of the definitions of intoxication was proven by the State to apply in this case beyond a reasonable doubt. The prosecutor then inquired of venire panel members whether, if the State had proved every element of the offense beyond a reasonable doubt, and that the defendant was intoxicated based on one of the definitions of intoxication, the panel members could convict the defendant of the charged offense. Those inquiries of the venire panel members are the questions on appeal that Avula characterizes as improper commitment questions.[6]

A commitment question "attempt[s] to bind or commit a prospective juror to a verdict based on a hypothetical set of facts." *Standefer v. State*, 59 S.W.3d 177, 179 (Tex. Crim. App. 2001) (quoting *Allridge v. State*, 850 S.W.2d 471, 480 (Tex. Crim. App. 1991)). Improper

---

[6] Avula also argues on that appeal that during closing argument, the prosecutor "stressed that the jury need only determine that [Avula] was intoxicated in order to convict [him] of the offense." We disagree with this characterization of this portion of the prosecutor's closing argument. Like the questions of the venire panel about which Avula complains on appeal, the prosecutor was reminding the jury of the three definitions of intoxication she discussed with the venire panel and that the jurors did not have to agree upon which one of the definitions the State proved beyond a reasonable doubt.

commitment questions are prohibited to "ensure that the jury will listen to the evidence with an open mind—a mind that is impartial and without bias or prejudice—and render a verdict based upon that evidence." *Sanchez v. State*, 165 S.W.3d 707, 712 (Tex. Crim. App. 2005). However, not all commitment questions are improper. *Id.*; *Standefer*, 59 S.W.3d at 181. The court of criminal appeals has articulated a three-part test for determining whether a voir dire question is an improper commitment question. *Standefer*, 59 S.W. at 179–83. First, the trial court must determine whether the particular question is a commitment question. *Id.* at 179. A question is a commitment question if "one or more of the possible answers is that the prospective juror would resolve or refrain from resolving an issue in the case on the basis of one or more facts contained in the question." *Id.* at 180. Second, if the question is a commitment question, the trial court must then determine whether it is a proper commitment question. *Id* at 181 ("When the law requires a certain type of commitment from jurors, the attorneys may ask the prospective jurors whether they can follow the law in that regard."). A commitment question is proper if one of the possible answers to the question gives rise to a valid challenge for cause. *Id.* at 182. If the question does not, then it is not a proper commitment question and it should not be allowed by the trial court. *Id.* Third, if the question does give rise to a valid challenge for cause, then the court must determine whether the question "contain[s] only those facts necessary to test whether a prospective juror is challengeable for cause." *Id.*

Here, the prosecutor informed the venire panel that the State had the burden of proof as to each of the elements of the charged offense, including the element of intoxication. Assuring through voir dire questioning that venire panel members could convict a defendant of driving while intoxicated with a passenger under fifteen years of age if the State proved every element of the offense beyond a reasonable doubt is not improper commitment questioning. A venire panel member's inability to so follow the law could lead to a valid challenge of that panel member for

–13–

cause. *See id*. at 181, 182. Avula has not directed us to any case holding that questions similar to those of the prosecutor here were fundamentally erroneous.

We conclude the questions by the prosecutor during voir dire cited by Avula were not improper commitment questions. Accordingly, we do not conclude that the allegedly improper voir dire questions rose to the level of fundamental error, reviewable without the need for objection at trial. *See Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009) (error not properly preserved must be "fundamental," meaning it was "so egregious and created such harm that the defendant 'has not had a fair and impartial trial.'") (quoting *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984)).[7] We resolve Avula's third point of error against him.

### Sufficiency of the Evidence of Intoxication

In his fourth point of error, Avula asserts there was insufficient evidence he was intoxicated because a standardized field sobriety test was improperly performed. According to Avula, insufficient evidence supports his conviction because the HGN test was improperly performed with Avula facing traffic and lights on the access road to the Dallas North Tollway. According to Avula, the fact that an HGN test could have been performed in the intoxilizer room of the Frisco jail after Avula's arrest further undermines the reliability of the HGN test procedure performed at the scene of the traffic stop and the results of that test. In his fifth point of error, Avula contends there was insufficient proof he was intoxicated because his blood test was improperly performed. Avula argues the DPS "uses unsound methods to test blood samples." Avula further argues the State did not present reliable expert testimony of retrograde extrapolation and no other evidence "logically raised an inference" Avula was intoxicated when

---

[7] *See Phillips v. State*, No. 05-08-01654-CR, 2010 WL 297942, at *1 (Tex. App.—Dallas Jan. 27, 2010, pet. ref'd) (not designated for publication); *see also Scott v. State*, No. 07-12-00375, 2013 WL 4528821, at *1 (Tex. App.—Amarillo Aug. 26, 2013, no pet.) (mem. op.) (not designated for publication) (contentions that the State engaged in improper voir dire questioning did not present fundamental error such that appellate court could review the issue not raised in the trial court).

–14–

he was driving.  Because the legal analysis is similar, we address points of error four and five together.

We review the sufficiency of the evidence under the standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979).  *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013).  We examine all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  *Jackson*, 443 U.S. at 319; *Matlock*, 392 S.W.3d at 667.  This standard recognizes "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Jackson*, 443 U.S. at 319; *see also Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011).  As the fact finder, the jury is entitled to judge the credibility of the witnesses, and can choose to believe all, some, or none of the testimony presented by the parties.  *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991); *see also Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012) ("The factfinder exclusively determines the weight and credibility of the evidence.").  We defer to the jury's determinations of credibility, and may not substitute our judgment for that of the jury.  *Jackson*, 443 U.S. at 319; *Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014); *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (in conducting legal sufficiency analysis, appellate court "may not re-weigh the evidence and substitute our judgment for that of the jury").  When there is conflicting evidence, we must presume the factfinder resolved the conflict in favor of the verdict, and defer to that resolution.  *Jackson*, 443 U.S. at 326; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).  Evidence is sufficient if "the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict."  *Wise*, 364 S.W.3d at 903.

At trial, the jury heard a 9-1-1 recording of a report identifying a vehicle matching that driven by Avula which was weaving, moving erratically, changing speed, and almost hitting the curb numerous times. The jury also heard the testimony of Moore who saw Avula's vehicle almost strike the curb on the left, crossing the lane divider a couple of times, and increasing speed to seventy miles per hour in a fifty-miles-per hour speed zone. Moore observed Avula's odd behavior of hitting himself in the head with his open hand and his fist after being stopped. Moore smelled alcohol on Avula's breath, and Avula admitted to Moore at the scene that he had been drinking. The jury heard Connell's testimony regarding Avula's poor performance on the standardized field sobriety tests and viewed the police videotape of Avula's performance of the walk-and-turn and the one-legged stand tests. *See Compton v. State*, 120 S.W.3d 375, 378–79 (Tex. App.—Texarkana 2003, pet. ref'd) (one-legged stand test "allows an individual to demonstrate his or her ability to remain balanced while standing on only one leg," and failure to remain balanced during test or comply properly with officer's directions may serve as clues of intoxication). At the Frisco jail, Avula again admitted he had been drinking. The Alcohol Analysis Laboratory Report admitted in evidence showed Avula's BAC was .18 grams of alcohol per 100 milliliters of blood, which was over the legal intoxication level of .08.

Avula's principal argument concerning the HGN test is that by performing the test at the scene of the stop in the presence of lights from passing traffic, Connell failed to follow NHTSA manual instructions for administering the HGN test, which compromised the accuracy of the test results. Nystagmus is an involuntary rapid oscillation of the eyes in a horizontal, vertical, or rotary direction. *Emerson v. State*, 880 S.W.2d 759, 765 (Tex. Crim. App. 1994); *Plouff v. State*, 192 S.W.3d 213, 218 (Tex. App.—Houston [14th Dist.] 2006, no pet.). HGN refers to the inability of the eyes to smoothly follow an object moving horizontally across the field of vision, particularly when the object is held at an angle of forty-five degrees or more to the side. *Plouff*,

192 S.W.3d at 218–19. The effect of alcohol on HGN is well-documented. *Emerson*, 880 S.W.2d at 766. "The DWI Detection Manual's prefatory language acknowledges that although the [standardized field sobriety] tests, when administered under ideal conditions, 'will generally serve as valid and useful indicators of impairment,' slight variations from the ideal 'may have some affect [sic] on the evidentiary weight given to the results.'" *Compton*, 120 S.W.3d at 378 (quoting Nat'l Highway Traffic Safety Admin., U.S. Dep't of Transp., DWI DETECTION AND STANDARDIZED FIELD SOBRIETY TESTING STUDENT MANUAL). The court of criminal appeals has noted that "[t]he accuracy of the HGN test has been estimated at various levels, depending on such factors as testing conditions and the ability and experience of those conducting the test," thereby acknowledging an HGN test will not be administered in strict conformity with an officer's training every time the officer performs the HGN test. *Id.* (quoting *Emerson*, 880 S.W.2d at 767).

If, indeed, the HGN test administered to Avula varied from the strict NHTSA manual instructions for administering the test, the deviation in the administration of the HGN test could have been found by the jury to be slight, and the jury was entitled to consider and determine the weight to be given the testimony regarding the results of the HGN test. *See Plouff*, 192 S.W.3d at 219 ("Slight variations in the administration of the HGN test do not render the evidence inadmissible or unreliable, but may affect the weight to be given the testimony."). We defer to the jury's role as the sole judge of the weight and credibility to be given to the evidence. *See Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

With regard to the testing of Avula's blood sample, Avula argues the blood test was improperly performed. While Avula criticizes the methodology used for testing the blood sample, he does not cite to any evidence that the test result was compromised. The jury heard Youngkin's testimony regarding the handling of the blood sample from the time it was delivered

–17–

to the crime lab and the process he utilized in performing the BAC test. Avula introduced no evidence at trial indicating Youngkin's testing was "improperly performed" or that the crime lab uses "unsound methods" of testing blood samples. The jury was entitled to weigh the credibility of Youngkin's testimony and the evidence regarding the testing of the blood sample and to determine the weight to be given that evidence. Avula further argues the State did not present reliable expert testimony of retrograde extrapolation. *See Mata v. State*, 46 S.W.3d 902, 908–09 (Tex. Crim. App. 2001) (defining retrograde extrapolation as "the computation back in time of the blood-alcohol level—that is, the estimation of the level at the time of driving based on a test result from some later time"). According to Avula, no evidence other than Youngkin's testimony regarding retrograde extrapolation of Avula's BAC "logically raised an inference" Avula was intoxicated when he was driving. *See Kirsch v. State*, 306 S.W.3d 738, 745 (Tex. Crim. App. 2010) (even absent expert retrograde extrapolation testimony, BAC-test results are often highly probative to prove both per se and impairment intoxication; BAC-test result, by itself, is not sufficient to prove intoxication at the time of driving; "There must be other evidence in the record that would support an inference that the defendant was intoxicated at the time of driving as well as at the time of taking the test."). Avula introduced no evidence at trial that Youngkin's testimony regarding retrograde extrapolation was unreliable, nor did Avula seek to have Youngkin's testimony on that subject excluded as unreliable. *See Hepner v. State*, 966 S.W.2d 153, 159 (Tex. App.—Austin 1998, no pet.) (defendant did not preserve his complaints that the State did not prove reliability of random match probability evidence).

Even if the jury chose to give less weight to the results of the HGN test because of the cross-examination of Connell, during which Avula attempted to discredit the reliability of the HGN test as it was administered or because an HGN test could have been performed at the Frisco jail, or to give less weight to the testimony of Youngkin regarding the blood sample

testing or his opinion on Avula's intoxication level at the time he was stopped based on retrograde extrapolation, we conclude a rational jury could have reasonably found the essential elements of the DWI offense beyond a reasonable doubt. After considering Moore's testimony concerning the circumstances causing him to stop Avula, listening to a recording of the 9-1-1 telephone call regarding the erratic maneuvering of Avula's vehicle, viewing the video recording of the traffic stop, including Avula's performance of the walk-and-turn and one-legged stand standardized field sobriety tests, hearing Avula's admissions at the scene and the Frisco jail that he had been drinking before operating the vehicle, and considering the BAC test result, we conclude the fact finder could have reasonably inferred Avula was intoxicated when he was driving and at the time of the BAC test. *See Kirsch*, 306 S.W.3d at 745 (evidence logically raising inference that defendant was intoxicated at the time of driving as well as at the time of the BAC test includes erratic driving, post-driving behavior such as stumbling, swaying, slurring or mumbling words, inability to perform field sobriety tests or follow directions, bloodshot eyes, admissions by defendant concerning what, when, and how much he had been drinking, "in short, any and all of the usual indicia of intoxication");[8] *see also Plouff*, 192 S.W.3d at 224; *Smith v. State*, 65 S.W.3d 332, 347 (Tex. App.—Waco 2001, no pet.) (walk-and-turn and one-legged stand tests "are grounded in common knowledge that excessive alcohol consumption can cause coordination, balance, and mental agility problems"; sole purpose of the walk-and-turn and one-legged stand tests "is to reveal clues or symptoms of impairment").

A rational jury could have reasonably concluded Avula was intoxicated—that is, he did not have the normal use of mental or physical faculties due to the introduction of alcohol or had an alcohol concentration of .08 or greater—at the time he was driving as well as at the time his

---

[8] *See also Moseman v. State*, No. 05-13-00304-CR, 2014 WL 2993826, at *3 (Tex. App.—Dallas June 30, 2014, no pet.) (mem. op.) (not designated for publication).

blood was drawn for the BAC test. *See* TEX. PENAL CODE ANN. § 49.01(2). Accordingly, we resolve Avula's fourth and fifth points of error against him.

**Demonstrative Exhibit**

In his sixth point of error, Avula argues his conviction should be reversed because the trial judge improperly permitted the State to utilize a chart as a demonstrative exhibit without laying the proper predicate. Avula contends the trial court erred by overruling his hearsay objection to the chart, and the trial court's ruling "affected the jury's decision." Avula argues the trial court improperly permitted the State's expert witness, Youngkin, to testify regarding the chart, because on voir dire examination by Avula's counsel, Youngkin testified he had no knowledge about who made the chart, the methodology used in making the chart, or whether the information in the chart had been peer reviewed.

Youngkin testified that in his education and training about the effects alcohol can have on the human body, he attended the week-long Borkenstein course on alcohol and traffic safety at Indiana University. The demonstrative exhibit, a chart entitled "Development of Acute Tolerance" was a part of the Borkenstein course materials. Youngkin testified he relied upon the chart to assist the jury by visually representing his testimony that signs of intoxication increase as BAC increases and signs of intoxication become less apparent as BAC decreases.

"Demonstrative evidence" is "evidence admitted to serve as a visual aid or illustration that meets the tests of relevancy and materiality, as well as the limitations imposed by Texas Rule of Evidence 403."[9] *Hartsock v. State*, 322 S.W.3d 775, 779 (Tex. App.—Fort Worth 2010, no pet.). "Demonstrative evidence has no independent relevance to the case but is offered to help explain or summarize the witness's testimony or to put events and conditions into a better

---

[9] Rule of evidence 403 provides that relevant evidence may be excluded if its probative value is substantially outweighed by "the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403.

–20–

perspective." *Id*. (citing *Torres v. State*, 116 S.W.3d 208, 213 (Tex. App.—El Paso 2003, no pet)).[10]  To establish the relevancy of demonstrative evidence, the proponent must first authenticate it. *Torres*, 116 S.W.3d at 213.  The proponent is then required to establish that the evidence is "fair and accurate" and that it helps the witness to demonstrate or illustrate his testimony. *Id*.; *see Simmons v. State*, 622 S.W.2d 111, 113 (Tex. Crim. App. [Panel Op.] 1981) (holding that demonstrative evidence is admissible if it tends to solve some issue in the case and is relevant, that is, if it sheds light on the subject at hand).  Demonstrative evidence must be properly identified "by showing that the item in question is what its proponent claims as opposed to any idea of speculation, conjecture, or presumption of what the exhibit represents." *Torres*, 116 S.W.3d at 213; *see* TEX. R. EVID. 901(a) (the required authentication or identification for admissibility is satisfied by evidence that supports a finding that the matter in question is what its proponent claims).  "Demonstrative evidence has no probative force beyond that which is lent to it by the credibility of the witness whose testimony it is used to explain." *Hartsock*, 322 S.W.3d at 779.

We review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010).  The trial court abuses its discretion when its ruling is arbitrary, unreasonable, or without reference to any guiding rules or principles. *Lyles v. State*, 850 S.W.2d 497, 502 (Tex. Crim. App. 1993).  The trial court does not abuse its discretion unless its determination lies outside the zone of reasonable disagreement. *Martinez*, 327 S.W.3d at 736.  The trial court's discretion to permit the use of visual aids, charts, and video recordings during trial is well established. *Baker v. State*, 177 S.W.3d 113, 123 (Tex. App.—Houston [1st Dist.] 2005, no pet.); *see also Clay v. State*, 592

---

[10] *See also Pitre v. State*, No. 09-95-140-CR, 1997 WL 414976, at *2 (Tex. App.—Beaumont July 23, 1997, no pet.) (not designated for publication) ("Texas courts have not treated demonstrative evidence, whether it be a map, model, drawing, chart, or diagram, as inadmissible hearsay.").

S.W.2d 609, 613 (Tex. Crim. App. [Panel Op.] 1980) (use of visual aid to illustrate witness's testimony is within discretion of trial court).

Youngkin testified the chart was acquired in the course of his education and training about the effects alcohol can have on the human body when he attended the week-long Borkenstein course on alcohol and traffic safety at Indiana University. Here, a review of the record indicates the chart was not used as direct or substantive evidence of a scientific method of proof that Avula was intoxicated, but to aid the jury in understanding the testimony of the expert, Youngkin, regarding the increase and decrease in signs of intoxication in relation to increases and decreases in BAC. Accordingly, as offered by the State, the chart constituted demonstrative evidence. The trial court properly instructed the jury that the chart was admitted only for the purpose of aiding the jury as a demonstrative exhibit. We conclude the trial court did not abuse its discretion in admitting the chart as a demonstrative exhibit. Accordingly, we resolve Avula's sixth issue against him.

## Cumulative Error

In his seventh point of error, Avula contends his conviction should be reversed under the cumulative error doctrine. Avula argues the trial was "so permeated with errors to make it fundamentally unfair," and errors in the trial, "even if not affording viable grounds for relief individually, aggregate into a due process violation."

With regard to Avula's argument that a number of errors may be found harmful in their cumulative effect, "a harm analysis is employed only when there is error, and ordinarily, error occurs only when the trial court makes a mistake." *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007) (quoting *Hawkins v. State*, 135 S.W.3d 72, 76–77 ( (Tex. Crim. App. 2004)). Having concluded, in resolving Avula's first six points of error against him, that there was no error by the trial court, we reject the basis of his seventh point of error and resolve it against him

–22–

as well. *See Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) ("[W]e are aware of no authority holding that non-errors may in their cumulative effect cause error."); *see also Rayford v. State*, 125 S.W.3d 521, 534 (Tex. Crim. App. 2003) (citing *Chamberlain*, 998 S.W.2d at 238, for proposition that "non-errors may not in cumulative effect cause error").[11] Accordingly, no cumulative error is shown, and we resolve Avula's seventh point of error against him.

### Conclusion

Having resolved Avula's points of error against him, we affirm the trial court's judgment.

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

130405F.U05

---

[11] *See also Underwood v. State*, No. 05-06-01589-CR, 2008 WL 3117077, at *11 (Tex. App.—Dallas Aug. 7, 2008, no pet.) (not designated for publication) (because the Court "found either no error or no harm in resolving [appellant's] issues against her," it rejected appellant's contention that the cumulative effect of the errors warranted reversal).



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

SRIHARI AVULA, Appellant

No. 05-13-00405-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 380th Judicial District Court, Collin County, Texas,
Trial Court Cause No. 296-80285-2012.
Opinion delivered by Justice Fillmore,
Justice Thomas (Ret.) participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered this 30th day of January, 2015.